[No. 1403.]

## JOHN ODLE v. THE STATE.

1. PRACTICE.—CHARGE OF THE COURT should instruct the jury as to the law applicable to every theory within the scope of the indictment which the evidence tends to establish, whether favorable to the State or the defendant.
2. SAME.—Because the evidence supporting a certain theory is strong enough to demand a charge thereon, it does not follow that a new trial should be refused because of the insufficiency of the evidence. The better practice is that, where the evidence tending to establish a certain theory is so meagre that the court would not hesitate to set aside the verdict, the charge should ignore the theory so presented.
3. SAME—NEW TRIAL should be awarded when it appears that the court has charged upon an inculpatory theory insufficiently supported by the evidence.
4. SAME.—Where there is evidence tending to support a theory for the defense, the law applicable thereto must be given in charge.
5. ROBBERY—FACT CASE.—See this case for evidence held sufficient to support a conviction for robbery.

APPEAL from the District Court of Orange. Tried below before the Hon. W. H. Ford.

The indictment was joint against the defendant, Hugh Harwell and Charles Frazier, charging them with the robbery of Joseph Bunn, in Orange county, Texas, on the thirty-first day of July, 1882. The defendant was tried alone, convicted, and awarded a term of ten years in the penitentiary.

Thomas Carraway, who was the first witness presented by the State, testified that he knew the defendant by sight, and pointed him out in court. At the time of the alleged robbery, on the thirty-first day of July, 1882, and for a considerable time previous thereto, the witness lived on the road about one mile west of Patrick's ferry, in Hardin county, Texas. Late in the evening previous to the alleged robbery of Bunn, three men on horseback passed the witness's house at so great a distance that the witness did not then recognize them. They were traveling towards Patrick's ferry. About eight o'clock on the morning after the alleged robbery three men passed the house, going from the direction of Patrick's ferry and traveling west. The witness at once recognized the defendant as one of the party. The other two the witness did not recognize instantly, as they had pulled their hats down over their faces, a fact which induced the witness to observe them critically. After they passed the house the two men with the defendant looked towards the witness, exposing their faces, and the witness readily recognized the man Frazier, whom he knew well, and Harwell, whom he knew by sight, and both of whom the witness pointed out in court.

Thomas Kirkpatrick testified, for the State, that he was acquainted with Odle, Frazier and Harwell, and identified each of them in court. At the time of the alleged robbery, the witness lived at and kept Patrick's ferry, on the west bank of the Neches river, about twenty-one miles from Bunn's Bluff. The defendant, Harwell and Frazier came to the witness's house late on the evening before the alleged robbery of Joseph Bunn, traveling east. They asked the witness where they could find grass upon which to stake their ponies and camp for the night. The witness directed them to an old field west from the ferry, and on the road they had traveled coming to the ferry. They left together, going in that direction, and the witness saw no more of them until about sunup next morning, when they came to the ferry and were crossed by the witness from the west to the east side of the river. While crossing the river, they told the witness that they were going to the tramway at Cairo, to hunt work.

The witness was hailed from across the river very early next morning, and, going down to the ferry, found the same parties, Odle, Frazier and Harwell, waiting on the east side to be recrossed to the west. The witness recrossed them, and they left together in a westerly direction, on the road leading from Pat-

rick's ferry into Hardin county. In traveling from Patrick's ferry to Bunn's Bluff, a person would go east from the river, about four miles, to the Jasper and Beaumont road, and then turn south with that road. To go from Patrick's ferry to Cairo, or the tramway, a person would go east to the same point on the Jasper and Beaumont road, and then turn north with that road. The witness had several times ridden from Patrick's ferry to Bunn's Bluff in a half day.

Clem Lee testified, for the State, that he was acquainted with the defendant, Harwell and Frazier, and identified them in open court. On the day of the alleged robbery of Joseph Bunn, the witness was traveling the Beaumont and Jasper road, going north, from Beaumont towards Jasper. After he had passed about a mile and a quarter, he met all three of these parties riding down the road together, and going in the direction of Bunn's Bluff. This was in the afternoon, not very long after twelve o'clock m.

P. L. Bunn testified, for the State, that he was acquainted with the defendant, Frazier and Harwell, and identified them in open court. He lived with his father, Joseph Bunn, at the time of the alleged robbery, and was at home on that day. As soon as he was informed of the robbery, he and other parties armed themselves and started in pursuit, taking the Beaumont and Jasper road, and going north. At a point about a half mile distant from Joseph Bunn's store, they discovered the fresh tracks of three horses, coming into the road from the woods on the east side, and found, at the same place, where they turned back into the woods on the same side. The tracks indicated that one was a small and the other two large horses. The tracks coming into the road from the woods were freshest, and turned north, up the road. The witness and his party followed these same tracks along the said road, north, to a point about four miles east of Patrick's ferry on the Neches river, where they turned west. From this point they followed the tracks to Patrick's ferry, and were put across the river by the ferryman. They continued the pursuit into Hardin county, and, on the next day, overhauled and arrested the defendant, Frazier and Harwell, in Hardin county.

As the party followed the trail of the horses up the Beaumont and Jasper road, they could see the tracks of the same three horses where they had passed down the road from the place a half mile above Bunn's Bluff, where they were first discovered,

the distance being about fifteen miles along the road. Above that the party could not see the tracks going towards Bunn's Bluff, because it had rained on that part of the road after they passed over it, and before they returned. But the tracks of the horses going up the road, and away from Bunn's Bluff, towards Patrick's ferry, were plain all the way and easily followed, and were followed by the witness and his party from where they were first discovered to Patrick's ferry.

Just before the party started in pursuit, a peddler arrived at Bunn's Bluff, having traveled down the road, south, from Jasper towards Beaumont, and told the witness and his party that he met three men near Bunn's, going up the road, north. This was the first information of the route taken by the men received by the witness, and he acted upon it immediately. The tracks of the peddler's horse were the only fresh horse tracks on that road until a point a half mile up the road was reached, where the fresh tracks described were found.

Joseph Bunn testified, for the State, that he was acquainted with the defendant, Harwell and Frazier, and identified them in open court. His narrative proceeds as follows:

"On the thirty-first day of July, 1882, the defendants Charles Frazier and Hugh Harwell came into my store at Bunn's Bluff, in Orange county, Texas, about three o'clock in the afternoon. They walked into my store and found me alone. Hugh Harwell bought some small article of me, the price of which was about one dollar, and gave me a twenty dollar silver certificate of the paper money currency of the United States of America to change and take my pay for the article purchased. I took the said silver certificate, changed it, and gave Harwell his change, some nineteen dollars in silver. I placed the silver certificate in my drawer, and, as I looked around again, I noticed that Hugh Harwell and Charles Frazier had their pistols in their hands. Hugh Harwell then remarked to me: "Hand out the balance of the money in that drawer." I had taken the silver I gave him in change out of that drawer just a moment before. I said to them: "Why! what do you mean?" Thereupon, the defendant Charles Frazier turned his pistol around on me and said: "Hand it out! hand it out! It is our business!" I then saw that they meant business, and, as I had no way to defend myself, felt my life to be in danger, and as I feared from their manner and actions with their pistols that they would take my life if I did not, I gave them the drawer and its contents.

Having obtained the drawer and contents, one of them ordered me to open my safe. I told him that the key was at the house, and that he would have to wait until I went after it. They then said: 'You get between us and go with us, and we will not hurt a hair of your head.' Still in fear of my life, and they still having their pistols in their hands, I marched off with them, south, down the Beaumont road, and in an opposite direction from my dwelling house. At a point about one hundred yards distant, they left me, and turned off into the woods on the east side of the road.

" As these men came into my store they came down the Beaumont and Jasper road from the north of my residence. They were on foot. There are some small patches of ground in cultivation just east of my store. After my sons had started in pursuit of the robbers, I went with other parties south to the point where the defendants Hugh Harwell and Charles Frazier had taken me, and we followed their trail east a short distance, to where it turned north, and after following it north for three or four hundred yards, we found where the horses had been tied. On the trail indicated we found the money drawer they had taken from me, and a nickle coin, and at the place where the horses had been hitched we found a vest.

"There was in that drawer, when I delivered it to Hugh Harwell and Charles Frazier, the silver certificate I got from them, which was of the denomination and value of twenty dollars. There were also a number of silver coins of the coin money of the United States of America, of the denomination of one dollar each. I cannot state how many there were, but each coin was of the value of one dollar. There was also a number of silver coins of the silver coin money of the United States of America of the denomination of half dollars. I cannot state exactly how many, but each coin was worth fifty cents. There were also a number of silver coins of the coin money of the United States of America, of the denomination of quarter dollars. I cannot state exactly how many, but each of them was of the value of twenty-five cents. All of the said moneys and coins, and the silver certificate described, were my property, except about three dollars worth of the silver coins, which belonged to the United States government, though in my possession. The whole amount of the said coins and the said silver certificate was of the aggregate value of one hundred and fifty dollars.

"I did not give either of the said defendants, Hugh Harwell,

or Charles Frazier, my consent to take any of the said money. I did not give it to them voluntarily. I gave it to Hugh Harwell and Charles Frazier, because I was afraid that they would shoot me if I did not do so. I did not see the defendant John Odle at any time during that day. I had seen him on former occasions and knew him, and once he passed the night at my house. I never saw the other two defendants before that day, but there is no chance for me to be mistaken in their identity. The two defendants, Hugh Harwell and Charles Frazier, were the two men who came into my store and robbed me. This all occurred in Orange county, State of Texas, at my store at Bunn's Bluff, on the thirty-first day of July, 1882."

The motion for new trial assailed the charge of the court, and the verdict as contrary both to the law and the evidence.

*J. T. Stark,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, J. The appellant was convicted, as a principal, in the robbery of Joseph Bunn.

Two questions are presented which we think require discussion. They are:

First. Did the court err in submitting to the jury a charge upon the subject of keeping watch, etc.?

Second. Is the verdict of the jury supported by the evidence?

If there be testimony tending to establish a certain theory within range of the charge contained in the indictment, the court should submit to the jury, by proper instructions, the law applicable to such theory. This should be done whether favorable to the State or the defendant.

It does not follow, however, that because there was evidence of sufficient force, or strength, to require a charge upon the theory presented by such evidence, that the court should refuse a new trial upon the insufficiency of the evidence. But if the evidence is of such meagre and doubtful character as that the court would not hesitate to set aside the verdict, it would be the better practice not to charge the law applicable to the theory so feebly presented by the evidence. If a charge has been given upon a theory not sufficiently supported by the evidence to warrant a conviction thereon, the court can, and should, redress the wrong by granting a new trial.

The observations apply to theories of the prosecution, it being a well settled rule "that if there be any evidence tending to present a theory for the defense, the law applicable thereto must be given in the charge." We are of the opinion, however, that the court did not err in submitting this theory of the State to the jury.

Third. Does the evidence support the verdict? While it is true that the statement of facts shows that the evidence might have been made stronger by showing that three horses were tied at the point at which they were found to have been hitched, still we are of the opinion that the verdict is supported by the evidence. (The Reporters will give the evidence.)

The judgment is affirmed.

*Affirmed.*

Opinion delivered March 21, 1883.